## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROW 1 INC. D/B/A REGENATIVE LABS,     )
    )
          Plaintiff,     )
    )
   v.     )
    )
**XAVIER BECERRA, SECRETARY OF**     )
**HEALTH AND HUMAN SERVICES**, solely in     )
his official capacity; **UNITED STATES**     )    No.
**DEPARTMENT OF HEALTH AND HUMAN**     )
**SERVICES**; **CHIQUITA BROOKS-LASURE,**     )
**ADMINISTRATOR OF CENTERS FOR**     )
**MEDICARE AND MEDICAID SERVICES**,     )
solely in her official capacity; and **CENTERS**     )
**FOR MEDICARE AND MEDICAID**     )
**SERVICES**; **NORIDIAN HEALTHCARE**     )
**SOLUTIONS, LLC**; **WISCONSIN**     )
**PHYSICIANS SERVICE INSURANCE**     )
**CORPORATION**; **NOVITAS SOLUTIONS,**     )
**INC.**; **NATIONAL GOVERNMENT**     )
**SERVICES, INC.**; **CGS ADMINISTRATORS,**     )
**LLC**; **PALMETTO GBA, LLC**; **FIRST**
**COAST SERVICE OPTIONS, INC.**,

          Defendants.

## VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, Row 1 Inc. d/b/a Regenative Labs ("Regenative" or "Plaintiff"), brings the following Verified Complaint against Xavier Becerra ("Becerra"), solely in his official capacity as Secretary of the United States Department of Health and Human Services; the United States Department of Health and Human Services ("HHS"); Chiquita Brooks-LaSure ("LaSure"), solely in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; the Centers for Medicare and Medicaid Services ("CMS"); Palmetto GBA, LLC ("Palmetto"); Noridian Healthcare Solutions, LLC ("Noridian"); Wisconsin Physicians Service Insurance Corporation ("WPS"); Novitas Solutions, Inc. ("Novitas"); National Government Services, Inc.

("NGS"); CGS Administrators, LLC ("CGS"); First Coast Service Options, Inc. ("FCSO") (collectively, "Defendants") for injunctive and declaratory relief and in support alleges as follows.

### NATURE OF THE ACTION

1.      Regenative is an American company that manufactures, markets, and distributes medical products containing human cells, tissues, or cellular or tissue-based products (HCT/Ps). Specific to this action, Regenative distributes Coretext and Protext, which consist of minimally manipulated Wharton's Jelly tissue. Wharton's Jelly is a connective tissue found in the umbilical cord.

2.      Under applicable federal law, the United States Food and Drug Administration ("FDA"), not CMS, regulates the manufacture, sale, marketing, and use of HCT/Ps and other biologic therapies under the Public Health Service Act ("PHSA").  There are two distinct types of cellular and tissue products regulated under the PHSA, which are regulated under two separate and detailed regulatory pathways created by Congress.  The first pathway includes HCT/Ps solely regulated by the FDA under Section 361, which must meet four criteria the FDA promulgated following notice and comment in 2001 (21 C.F.R. §1271.10(a)).  The statutes and regulations exempt these HCT/P products from licensing or pre-market approval from FDA prior to sale, distribution, and use.  In contrast, if a biologic therapy product does not meet all the criteria outlined for Section 361 products, then FDA  regulates it  as a "drug, device, or biological product" under Section 351 (biologics) or the Federal Food, Drug, and Cosmetic Act ("FDCA") (drugs). Cellular or tissue products that do not meet Section 361's criteria signal greater safety risks that warrant premarket review and approval under Section 351.

3.      Since beginning operations, Regenative has taken all steps necessary to ensure that its products, Coretext and Protext, satisfy the elements required to be marketed, distributed, and regulated solely under Section 361, including registering with the FDA, listing its HCT/Ps with

the FDA, following legal and scientific guidance, and applying for and receiving a Q-code from CMS (Q4246), which expressly recognized Regenative's products are 361 products. To date, the FDA has not rejected or otherwise indicated any disagreement with the designation of Regenative's products as being regulated solely under Section 361. Regenative has ensured that its products meet the four criteria necessary for Section 361 regulation, including, *inter alia*, that they have only minimal manipulation and that they are intended for homologous use only (as opposed to a treatment for specific conditions and diseases for Section 351). Examples of Section 361 products include skin, tendons, cartilage, and connective tissues, including those found in the umbilical cord; whereas examples of Section 351 products include gene therapy products, cultured nerve cells, prescription drugs, medical devices, and lymphocyte immune therapy.

4.     Since February 14, 2020, Regenative has sold its products, Coretext and Protext, as 361 products, and providers received reimbursement from Medicare Administrative Contractors ("MACs")[1] under Q-Code Q4246. MACs are private health insurers that contract with CMS and serve as the primary operational contacts between the Medicare fee–for-service (FFS) program and the health care providers enrolled in the program. Pursuant to that arrangement, the MACs, *inter alia*, process claims on behalf of Medicare.

5.     However, in late 2021 and continuing into 2022, Regenative became aware that the MACs were processing claims for its products differently, as some MACs were reimbursing claims for Regenative's products pursuant to Q4246, but others were denying claims for various reasons (and often could not explain the basis for the denials).

6.     On or around February 8, 2022, Regenative learned of an email from one of the MACs that stated, "CMS has temporarily frozen ALL biologics being billed with a Q code. There

---

[1] The MACs include Defendants Palmetto, Noridian, WPS, Novitas, NGS, CGS and FCSO.

have been changes to the fees [sic] schedules and they are updating their billing platform.  For that reason, claims are not being processed.  To be clear, they are NOT denied, they just are holding off adjudicating the claims so they have time to properly update."

7.    For the next couple of weeks, Regenative heard nothing further from that MAC or any other MAC.  However, in late February 2022, each of the MACs (upon information and belief, in a coordinated effort orchestrated by CMS and HHS) released a statement, without notice-and-comment, stating that each MAC will deny all claims (and recoup payments made for previous claims paid between December 6, 2019 to the present) for amniotic and placental tissue products, in general, and without recognizing or otherwise acknowledging the regulatory distinction between Section 351 and Section 361 products (the "Policy").  Each Policy statement references "manipulated" cells or tissues that are biologics intended to treat illnesses – all factors that explicitly refer to Section 351 products but have no application or bearing on Section 361 products.  Each MAC's Policy is a blanket denial of all claims for any amniotic or placental tissue products also references the same informal FDA statements for support, the content of which exclusively applies solely to Section 351 products.  Ignoring the difference between the two regulatory pathways, while relying upon factors applicable only to Section 351 products, Defendants paint with a broad brush and in contravention of Congressional intent, impermissibly and improperly apply Section 351 approval requirements to Section 361 products.  Indeed, one MAC's Policy notice provides that "any amniotic and/or placental derived products without Pre-Market Approval under section 351 of the [PHSA] and the [FD&C] Act, along with their associated services will be denied."  Not only does this ignore the regulatory framework Congress enacted, it also ignores the express language of CMS National Coverage Determinations ("NCDs"), which cover Section 361 products and are binding on the MACs.  Stated another way, the MAC Policy ignores the law

Congress enacted and conflicts with the plain language of binding CMS decisions. Yet, Defendants are moving forward in an effort to take on the roles of Congress and the FDA to improperly implement and enforce improper guidance with draconian results.

8.      In February 2022, Defendants issued policy notices, which relied on the same references and were virtually-identical to one another, relating to the denial of claims for amniotic and placental tissue products, without regard to whether the products are 361 or 351 products. The Defendants' policy notices were issued in accordance with the Policy that was implemented without notice-and-comment, or any other form of due process. The grounds for the Defendants' policy notices are apparently based upon a misunderstanding of a three random FDA statements issued between 2019 and 2021, none of which went through the formal FDA review process. The FDA statements discuss only those factors that relate to biologic cellular or tissue products regulated under *Section 351*– not Section 361 products.      Defendants then misinterpreted, misunderstood, and/or misapplied those FDA statements, overstepped the scope of their authority by branching into the realm of the FDA, ignoried the applicable existing statutory framework, and issued a blanket Policy notices *on all amniotic and placental tissue products* without notice-and-comment. Further, the CMS/MAC denial notices state that they will retroactively seek to recoup all payments made for these products. As a result of this unauthorized rule making and this wholly-improper, overreaching conduct, Regenative will suffer irreparable harm, because it will likely need to close its business unless the CMS/MACs are enjoined from implementing a policy that ignores the statutory framework Congress enacted, that ignores Congressional intent, and that delves into rule-making that is expressly beyond the reach of CMS or its MACs.

9.      Defendants, via the Policy, invade the statutory authority of the FDA by requiring all placental tissue products, including Regenative's Section 361 products, to become classified as

and receive Pre-Market FDA Approval under Section 351.  Defendants' Policy has no reasonable grounds, and Defendants clearly did not adequately consider the circumstances surrounding all amniotic and placental products.  Moreover, Defendants' Policy contradicts the careful, detailed Congressional distinction between 351 and 361 products as outlined in the PHSA.

10.     Defendants' Policy: (1) is arbitrary and capricious, as it was made without reasonable grounds; (2) exceeds its statutory authority; (3) contradicts Congressional intent, and (4) violates procedural requirements, and Regenative's due process rights, by failing to provide an opportunity for notice-and-comment.  As a result of this illegal and invalid Policy, and without this Court issuing a preliminary injunction, Regenative will suffer irreparable harm due to Defendants attempting to regulate Regenative's lawfully marketed Section 361 HCT/Ps as Section 351 biologic products, which will create imminent harm to Regenative, as  it may soon need to close its business because many providers will not be able to purchase its products without reimbursement, and it creates confusion in the medical community whether Regenative's products are lawfully marketed and used, when Regenative has taken great care to ensure that its products meet all requirements of Section 361 and are properly marketed, labeled, and promoted for use under that regulatory pathway.  CMS lacks the authority to step into the shoes of the FDA or to ignore the statutes Congress enacted.  However, if the Policy is allowed to go forward and be enforced, then such improper, overreaching conduct will be endorsed and allowed to stand without an iota of authority or support while having a devastating effect on Regenative.

**PARTIES**

11.     Plaintiff Row 1 Inc. d/b/a Regenative Labs is a Delaware corporation with a principal place of business in Pensacola, Florida.  Regenative focuses its business operations on producing and selling HCT/Ps.  Regenative has processed and manufactured multiple products, including Coretext and Protext (Wharton's Jelly products that have their own Q-code from CMS

(Q4246)).  Regenative has registered with the FDA and listed its products with the FDA, as required by Section 361 of the Public Health Service Act.  Regenative employs 45 individuals.

12.    Defendant HHS is the cabinet department charged with administration of the Medicaid and Medicare programs.

13.    Defendant Becerra is sued solely in his official capacity as the Secretary of HHS.

14.    Defendant CMS is the agency within HHS charged with administration of the Medicaid and Medicare programs.

15.    Defendant LaSure is sued solely in her official capacity as the Administrator of CMS.

16.    Defendant Palmetto is a South Carolina limited liability company with a principal place of business in Columbia, South Carolina, and is the CMS MAC for Jurisdiction J, covering Alabama, Georgia and Tennessee, and Jurisdiction M, covering North Carolina, South Carolina, Virginia and West Virginia.

17.    Defendant Noridian is a Delaware limited liability company with a principal place of business in Fargo, North Dakota, and is the CMS MAC for Jurisdiction E, covering California, Hawaii, Nevada, American Samoa, Guam and the North Mariana Islands, and Jurisdiction F covering Alaska, Arizona, Idaho, Montana, North Dakota, Oregon, South Dakota, Utah, Washington and Wyoming.

18.    Defendant WPS is a Wisconsin corporation with a principal place of business in Madison, Wisconsin, and is the CMS MAC for Jurisdiction J, covering Indiana and Michigan.

19.    Defendant Novitas is a Pennsylvania corporation with a principal place of business in Mechanicsburg, Pennsylvania, and is the CMS MAC for Jurisdiction H, covering Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, Texas and the Indian Health Service

and Veterans Affairs, and Jurisdiction L, covering Delaware, Maryland, New Jersey, Pennsylvania and the Washington D.C. Metro Area.

20.    Defendant NGS is an Indiana corporation with a principal place of business in Indianapolis, Indiana, and is the CMS MAC for Jurisdiction K, covering Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island and Vermont, and Jurisdiction 6, covering Illinois, Minnesota and Wisconsin.

21.    Defendant CGS is a Delaware limited liability company with a principal place of business in Nashville, Tennessee, and is the CMS MAC for Jurisdiction 15, covering Kentucky and Ohio.

22.    Defendant FCSO is a Florida corporation with a principal place of business in Jacksonville, Florida, and is the CMS MAC for Jurisdiction N, covering Florida, Puerto Rico and the United States Virgin Islands.

## JURISDICTION AND VENUE

23.    Jurisdiction in this matter rests on 28 U.S.C. §§ 1331 and 1361, 5 U.S.C. §§ 551-559, 701-706, and 28 U.S.C. §§ 1361, 1651, and 2201-2202.

24.    This Court has personal jurisdiction over Defendants because they reside within this District.

25.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## STATUTORY AND REGULATORY BACKGROUND

### The Food and Drug Administration

26.    The Federal Food, Drug, and Cosmetic Act (FDCA) established the FDA's authority as a federal agency of the HHS. 21 U.S.C. § 393.  The FDA is responsible for and possesses the authority for protecting and promoting public health through the control and

supervision of food safety, biopharmaceuticals, and other products, by reviewing clinical research and taking appropriate action on the marketing of those regulated products. *Id*.

27.     The FDA's primary focus is enforcement of the FDCA but also enforces other laws, notably Sections 351 and 361 of the PHSA.

28.     Currently, the FDA's Center for Biologics Evaluation and Research (CBER) is responsible for regulating biologic products and HCT/Ps.

29.     Based on applicable statutes, there are two detailed, distinct regulatory pathways that Congress has established for the two different types of cellular or tissue products to reflect what it considers to be the differing "relative risk" for each type of product.

30.     These pathways are commonly called "361" and "351" (which refer to two sections of the PHSA).

31.     Section 361 products that meet all the criteria set forth in 21 CFR § 1271.10(a) are regulated as HCT/Ps and are not required to be licensed or approved by the FDA.  These products are called "Section 361 products," because they are regulated solely under Section 361 of the PHSA.

32.     Under 21 CFR § 1271.10(a), An HCT/P is regulated solely under Section 361 of the PHSA if it meets all of the following requirements:

   a)  the HCT/P is minimally-manipulated;

   b)  the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;

   c)  the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, other than water, crystalloids, or a preserving, sterilizing, or storage agent provided such other article does not raise a new clinical safety concern; and

   d)  the HCT/P does not have a systemic effect and is not dependent on the metabolic activity of living cells for its primary function.

33.    Products that meet the criteria of Section 361 are not subject to any FDA pre-approval process and, as a result, are not required to have any clinical data prior to marketing.

34.    FDA Guidance regarding the requirements for HCT/Ps under Section 361 confirms the distinctions between HCT/Ps regulated solely under Section 361, and biologic products regulated under Section 351. *See* FDA Guidance July 2020, Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products:  Minimal Manipulation and Homologous Use, attached hereto as **Exhibit A**.

35.    It is the FDA's sole authority to regulate and enforce the different requirements imposed by Congress on those two separate types of products – Section 361 and Section 351. *See* 66 Fed. Reg. 5447, 5449 (Jan. 19, 2001) (stating the FDA was issuing a final rule under Section 361, which provides that the FDA may make and enforce regulations necessary to prevent the introduction, transmission, or spread of communicable diseases between the States or from foreign countries into the States (citations omitted)).

36.    Regenative has registered with, listed its products with, and notified the FDA that it is selling Coretext and Protext, and it has satisfied the four elements necessary to be regulated solely under Section 361.

37.    To date, the FDA has never rejected or otherwise indicated any disagreement with the designation of Regenative's products as being properly regulated solely under Section 361. The determination as to whether a product is regulated as an HCT/P under Section 361 or a biologic or drug under Section 351 is made by the FDA, not CMS.

38.    In contrast, if a product does not meet all the criteria outlined in 21 CFR § 1271.10(a)), then it is regulated as a "drug, device, or biological product" under Section 351 and the FDCA.

39.    Biologic products that do not meet one or more of the criteria for Section 361 products have greater safety risks that warrant premarket FDA review and approval and additional protections required by Section 351.

40.    Section 351 defines a biologic product as a "virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings." Public Health Service Act, Pub. L. No. 78-410, § 351, 58 Stat. 682, 702 (1944).

41.    Section 351 biologic products require clinical trials to demonstrate safety and efficacy in a process that is highly similar to what is required for drug products regulated under the FDCA to enter the marketplace.

42.    An important regulatory distinction also exists with respect to the use of a Section 361 production versus a Section 351 product.

43.    A Section 361 Product is manufactured, marketed, distributed, and sold for homologous use only, which means it serves the same basic function in the recipient as it did in the donor.  Stated another way, a Section 361 product is marketed on, and used for, its function in the human body. In making this determination, the FDA looks at whether products are advertised, labeled, and other indications of the manufacturer's intent for non-homologous use.  "In the absence of advertising, labeling, or other indications of the manufacturer's intent for such [non-homologous] use, we [FDA] would not require premarket submissions."  66 Fed. Reg. at 5458.

44.    In contrast, a Section 351 product is manufactured and marketed as being used to treat a specific disease or condition (i.e., an indication), and in such instances, the FDA must approve such products for each specific indication prior to marketing or distribution of the biologic.

45.     Examples of Section 361 products include skin, tendons, cartilage, and connective tissue found in the umbilical cord; whereas examples of Section 351 products include gene therapy products, cultured nerve cells, and lymphocyte immune therapy.  The differences between these two different types of products are vast in nature and use.

46.     Accordingly, Congress expressly enacted two separate and detailed regulatory regimes for tissue-based products regulated as Section 351 or Section 361 products, and each of those regimes have very different requirements for marketing and use.

47.     Another important distinction between Section 361 products and Section 351 products is the degree of manipulation.

48.     Section 361 products are required to be only minimally manipulated, while Section 351 products can be manipulated in many ways in the course of their manufacture.

49.     The difference in manipulation of the two distinct product types contributes to the differing relative risk assessments for the two different types of products, and is one reason why manipulated Section 351 products require FDA approval before marketing, whereas minimally manipulated Section 361 products do not.

50.     FDA has issued Guidance, explaining for industry what homologous use means and what qualifies as minimally manipulated.  *See* **Exhibit A**.

51.     The FDA, not CMS, is responsible for determining whether a product is regulated under Section 361 or Section 351 regulation.  Food & Drug Admin., Guidance for Industry: Regulation of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps) - Small Entity Compliance Guide 1-2 (2007).

Centers for Medicare and Medicaid Services

52.    Defendant HHS is the federal cabinet department charged with the administration of the Medicaid and Medicare programs.

53.    The Social Security Amendments of 1965 established Medicaid and Medicare and placed them under HHS' purview.  Social Security Amendments of 1965, Pub. L. No. 89-97, §§ 226, 1901 79 Stat. 286, 290, 343-44.  CMS is the entity to which HHS has delegated many of its Medicaid- and Medicare-administration responsibilities.

54.    The Centers for Medicare and Medicaid Services ("CMS") was established in 1977 (first named the Health Care Finance Administration until July 2001), and provides oversight to the nation's major healthcare programs, including Medicare and Medicaid.

55.    CMS' role in overseeing the nation's major healthcare programs includes enforcing quality standards in clinical laboratories, incentivizing technological advancement in healthcare facilities, ensuring proper use and treatment of patient information, and determining which healthcare claims get reimbursed. *See* Clinical Laboratory Improvement Amendments of 1988, Pub. L. No. 100-578, 102 Stat. 2903 (CLIA); HITECH Act, Pub. L. No. 111-5, 123 Stat. 226 (2009); Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936; Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286.

56.    CMS and the Secretary of HHS are statutorily authorized to enter into contracts with MACs, which are multi-state, regional contractors responsible for administering Medicare claims, making payments on claims, determining payment amounts, setting policy statements, and establishing local coverage determinations ("LCDs"), among other things. 42 U.S.C. § 1395kk-1.

57.    The creation of MACs is authorized by statute under the Social Security Act.  *Id*.

58.     Congress clearly and simply intended for the FDA to have authority separate from, and protected from overreach by, CMS and its MACs.

## FACTUAL BACKGROUND

59.     Regenative has identified, registered, and listed its products, including Coretext and Protext, with the FDA as Section 361 products.

60.     To date, the FDA has not rejected or otherwise indicated any disagreement with the designation of Regenative's products as being regulated solely under Section 361.

61.     FDA is the agency responsible for implementation and enforcement of the Public Health Service Act, and accordingly the regulation of Section 351 products and Section 361 products.

62.     Regenative has complied with all regulatory requirements for Section 361 products set forth by FDA.  Regenative's Cortex and Protext products:

- Are "minimally-manipulated;"

- Are intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;

- The manufacturing of such products does not involve the combination of the cells or tissues with another article, other than water, crystalloids, or a preserving, sterilizing, or storage agent provided such other article does not raise a new clinical safety concern; and

- And they do not have a systemic effect and are not dependent on the metabolic activity of living cells for their primary function.

63.     In 2020, Regenative applied for, and was awarded by CMS, a Q-code for reimbursement of its products (Q4246).

64.     When Regenative applied for a Q-code, it went through a number of steps and reviews.

- 14 -

65.    In the first quarter of 2020, eleven (11) Wharton's Jelly products sought HCPCS codes, including Regenative's Coretext and Protext.   Four manufacturers received Q-codes (although one was referred to the FDA's Tissue Reference Group), and seven manufacturers' products were denied codes for multiple reasons, including the failure to meet all requirements of Section 361.

64.    Based on the review of the 11 applications in the first quarter of 2020, it is clear CMS was aware of and applied FDA's Guidance and review of TRG references in reviewing all applications, including Regenative's, and in making final decisions.  And as noted above, CMS approved Regenative's application and identified Coretext and Protext as 361 Products.

65.    Notably, in awarding the Q-code, CMS expressly acknowledged and recognized Regenative's products at that time as a "361 Product." To date, CMS has provided no indication as to why its prior recognition of Regenative's products as 361 products has changed, the basis for any such change, or the analysis that must be present to effectuate such a change.

66.    CMS did not require that Regenative seek further guidance or clarification from the FDA or the FDA's Tissue Reference Group.

67.    In contrast, in the first quarter of 2020, other tissue-based products were denied a HCPCS code because of FDA Guidance and their inability to satisfy Section 361's requirements, while certain other tissue-based products were referred to the FDA's Tissue Reference Group.

68.    Thus, in sum, the FDA has not objected to Regenative's identification and listing of Coretext and Protext as 361 products, and CMS expressly recognized Regenative's Coretext and Protext as Section 361 products at the same time it clearly demonstrated it was well aware of the two regulatory pathways, the requirements of each, and the differences between Section 351

and Section 361 products.  However, the Policy notices ignore the entirety of this history and instead impermissibly treat all amniotic and placental tissue products the same.

69.     Since February 14, 2020, Regenative has sold its Section 361 products, including Coretext and Protext, and MACs generally reimbursed claims for its products under code Q4246.

70.     In late 2021, however, Regenative noticed and learned that MACs were handling claims for its products differently.

71.     For example, one MAC began denying claims based on error code 188, which states that the product does not follow FDA recommendations.  Notably, when asked about that denial code and to identify the specific guidance applicable to Section 361 products that was not followed, the MAC could not do so.

72.     On or about February 8, 2022, one of the MAC stated that CMS had placed a freeze on all amniotic and placental tissue products reimbursed through a Q-Code.  In that communication, the MAC said that claims were being held to allow CMS to have ample time to update the fee schedules and further expressly stated that the claims were not denied but were instead simply held.

73.     Regenative heard nothing further until late February 2022, when each of the MACs, on behalf of CMS, released a policy guidance notice relating to amniotic and placental tissue products, in general, and without distinguishing between Section 351 and Section 361 products or the two separate, detailed regulatory schemes with extremely different regulatory requirements that governed each class of products. (the "Policy").  See attached as **Exhibit C**, a true and correct copy of each of the MAC's notices.

74.     Each MAC's notice was released nearly simultaneously, is virtually identical, and references the same informal FDA statements in support of its position (while doing so and interpreting those statements in a troubling way that ignores and is contrary to applicable law).

75.     This simultaneous and identical Policy statement by *all* MACs can only be viewed and considered as a Policy statement issued by CMS via its MAC contractors.  There are no substantive difference between the Policy notices, and thus this Policy must be the result of coordinated CMS policymaking.

76.     The crux and substance of the MAC Policy notices can be summarized as follows:

a)  The plain language of the notices places important limits on the reach of certain decisions.  Specifically, the notices apply to "manipulated amniotic and/or placental tissue biologics for injections to treat illness…. Per the FDA, these products may only be provided within approved investigational new drug (IND) trials."  See, e.g., First Coast Service Option Notice, a copy of which is attached hereto as **Exhibit D**;

b)  In support of this position, each of the MACs references three informal statements from the FDA that were published between December 6, 2019 and June 3, 2021 (and based on the plain language of the concerns expressed therein, only involved and applied to Section 351 products while saying nothing applicable to products regulated solely under Section 361); and

c)  Effective March 16, 2022, the respective MAC will deny all claims affected by the notice and seek to recoup all claims paid from December 6, 2019 to the present.

77.     The content of the Policy and the subsequent billing decisions is troubling and improper for several reasons.

78.     CMS had a previous policy of reimbursing Regenative's Section 361 products, and then abruptly, without notice-and-comment, proper authority, or a reasoned analysis, issued this Policy that for all practical purposes eliminated the Section 361 regulatory pathway and pushed all placental or amniotic tissue HCT/Ps into the Section 351 regulatory scheme.

79.     The plain language of each MAC notice expressly references: (1) "manipulated" cells or tissue; (2) biologics; (3) treatment for illness; and (4) the requirement of at least an IND to provide such products.

80.     Each of these factors are applicable to products governed under Section 351 of the PHSA and require FDA clearance prior to marketing or distribution.  As such, the concerns identified in the notices should be limited to products regulated under Section 351; however, that is not the case.   Indeed, subsequent to the issuance of the Policy, one MAC has expressly stated that it will be denying all claims submitted for Regenative's products billed under Q4246 based on the late February Policy notices.  This statement exemplifies the lack of understanding of the limitations of that Policy and wholly ignores its inapplicability to Regenative's 361 products.

81.     These factors have no application to a product regulated solely under Section 361 and can provide no basis for denying claims for such products.  For example, Regenative's products are (1) minimally manipulated; (2) not biologics; and (3) marketed and used for homologous use (i.e., function) rather than used to treat any particular illness or condition.

82.     Ignoring the difference between the two regulatory pathways, while relying upon factors only applicable to Section 351 products, the MACs are painting with a broad brush and applying Section 351 factors to Section 361 products, which ignores the existing statutory framework, Congressional intent behind creating two separate regulatory pathways, and which invades the province of FDA's authority.

83.     Indeed, one MAC's notice, as part of CMS' Policy, provides that "any amniotic and/or placental derived products without Pre-Market Approval under section 351 of the [PHSA] and the [FD&C] Act, along with their associated services will be denied."  *See* **Exhibit E**.

- 18 -

84.     Defendants, through the Policy, invade the statutory authority of the FDA in requiring all placental tissue products, including Regenative's Section 361 products, to become classified as and receive pre-market FDA approval under Section 351.  In essence, the actions of Defendants described in the policy notices do not constitute proper rule-making; instead, it is indicative of Defendants taking on the role of Congress in determining what review processes will be applied (despite their proposed solution's circumvention of Congress' clear, plain intent concerning the regulatory framework).   Nothing provides CMS, much less its MACs, with such unfettered discretion.

85.     The Policy has no reasonable grounds and Defendants have not adequately considered the circumstances surrounding all amniotic and placental tissue products.

86.     This new Policy issued by CMS interferes with the Congressional intent of two separate regulatory pathways with different requirements (Sections 351 and 361), and takes on the duties of the FDA in requiring all placental tissue products to become classified and receive Pre-Market Approval under Section 351.

87.     CMS' new Policy, set forth in the uniform statements by the MACs, is outside the scope of both CMS' and the MACs' authority, invades the realm of clear FDA authority, and improperly applies standards applicable to one class of products (Section 351) to all placental and amniotic cellular and tissue based products (including Section 361).

88.     CMS, in issuing that Policy via its MACs, did not provide an opportunity for notice-and-comment.

89.     Indeed, CMS and its MACs ignored criticisms raised by Regenative with respect to the issues with the Policy.

90.    CMS, via its MACs, have enacted a new agency Policy that changes the methodology under which it will approve (or deny) claims.

91.    The new Policy arbitrarily and capriciously denies coverage for all placenta tissue products based on a misinterpretation of FDA informal statements.

92.    The new Policy to make blanket coverage determinations based on misinterpretations of FDA informal statements also denies due process to companies that sell and have sold Section 361 products, like Regenative.

93.    Regenative, as a manufacturer and not a provider or beneficiary, has no ability under the Medicare Act to challenge or appeal any CMS or MAC rulemaking, policy or adjudication, and without the opportunity for notice-and-comment has no ability to challenge whatsoever without petitioning a judicial court for review.  42 U.S.C. §§ 405(b)(1), 1395oo(a), (j); *Council for Urological Ints. v. Burwell*, 790 F.3d 212 (D.C. Cir. 2015) ("[T]he statute only permits Medicare 'providers' who bill Medicare to seek administrative review . . . .").   Regenative's claims attack the validity of the Policy and the manner in which it was improperly implemented. Without immediate judicial review, Regenative will be in a position where there is no review of or check on Defendants' improper actions and conduct.

94.    In addition, the informal FDA statements referenced in each MAC's notice reveal further problems with the new Policy for requiring that Section 361 placenta tissue products become registered and approved by the FDA as Section 351 products.

95.    Notably, none of the three FDA statements referenced by the Policy notices constitutes formal guidance and are not rules or regulations, which would have been subject to review, notice and comment.  None of the three FDA statements sought to alter or amend FDA policy or regulation.

96.     Further, the FDA statements make clear that the Policy notices should apply only to Section 351 products, as the FDA statements discussed "*manipulated* biologic products *used to treat diseases and conditions*," which require FDA approval but have not yet been approved.

97.     Section 361 HCT/P products, like Regenative's products, must be only minimally manipulated and intended for only homologous use.

98.     The FDA statements relied upon by the MACs and CMS concern only one class of placental tissue products – those governed by Section 351 – and do not concern whatsoever those products governed by Section 361.

99.     Yet, despite the limited applicability of the referenced FDA statements, CMS, through its MACs, has issued new Policy guidance, without notice or comment, which applies to all placental tissue products, ignoring and/or exceeding Congressional intent, the plain language of the applicable statutory framework recognizing two classes of products, and the limits on an agency's and agency contractor's discretion and authority.

100.    The effect of the Policy guidance on Regenative is substantial, imminent and irreparable.

101.    The Policy makes clear that Regenative's products will no longer be reimbursed by CMS.

102.    Without reimbursement from CMS, many healthcare providers will no longer purchase and use Regenative's products, and Regenative will be forced to close its business and let go as many as 45 employees.

103.    Further, the Policy causes harm to Regenative by suggesting that Regenative's products are not allowed to be marketed or used under Federal law, needlessly and improperly creating confusion in the medical community as to whether Regenative's products are lawful.

104.    Regenative will suffer substantial, irreparable, and imminent harm absent injunctive relief against the enforcement of the Policy.

105.    A retroactive reimbursement statement will not remedy the harm because Regenative will already be forced to close its business.

106.    The Policy also calls into question the scope and boundaries of authority possessed by the FDA and CMS, which Congress has defined by statute.

**PLAINTIFF'S CLAIMS FOR RELIEF**
**COUNT I**
**Declaratory And Injunctive Relief**
**(The Policy Is Arbitrary and Capricious)**

107.    Plaintiff incorporates each of the paragraphs in this Complaint as if fully set forth herein.

108.    The Policy is contrary to the clearly expressed Congressional intent, contrary to the FDA's distinction between Section 351 and Section 361 products, and is arbitrary, capricious, and contrary to law.

109.    The FDA has accepted Regenative's registration of its products as Section 361 products, and Defendants have illegally re-classified Regenative's products as Section 351 products.

110.    The Policy was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of authority granted by law, and without observance of procedure required by law, in violation of statute and the APA.

111.    Despite CMS implementing a nationwide "freeze" on all claims for amniotic and placental tissue products and despite the MACs implementation of virtually-identical notices that rely on the same FDA statements nearly simultaneously, the notices should not be considered to

be local coverage determinations (LCDs). There is nothing "local" about a nationwide, identical issuance of a policy by contractors (the MACs) over which CMS has control. This argument solely addresses the fact that even *if* the Policy statement consisted of individual LCDs, they would still be invalid. If CMS wants to change a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to provide services, then it must follow Congress' requirements, including providing for notice and allowing comments. *See* 42 U.S.C. § 1395hh(a)(2). That did not happen here, and CMS cannot circumvent statutory requirements affording due process by implementing a substantive change nationwide through the MACs. Even if Defendants want to classify the denial notices as LCDs, that argument again fails. In addition to being a national determination, the denial notices did not follow any of the statutory requirements, including providing 45 days' notice, required to do so. *See* 42 U.S.C. § 1395y(l)(D)(5). Given the coordinated nationwide effort and Defendants' failure to comply with statutory requirements, including notice and comment, the denial notices are not LCDs.

112.    As such, the Policy is invalid because Defendants failed to provide the industry and public with an opportunity for notice-and-comment before publishing the Policy. The Administrative Procedure Act requires agencies to provide an opportunity for industry and public notice-and-comment before issuing any rule or policy, unless the agency can prove a good-cause exemption. 5 U.S.C. § 553(b). Similarly, any local coverage determination, assuming *arguendo* that this national policy at issue here is alleged to be an LCD, must go through a notice-and-comment procedure. 42 U.S.C. § 1395y(l)(D)(5). Because the Policy is a prospective statement that provides a definitive ruling on the methodology that Defendants, via the MACs, will deny reimbursement, and because the Policy affects the rights of a broad class of unspecified entities, the Policy is a rule requiring notice-and-comment despite being under the cloak of a guidance

statement. *See Marcum v. Salazar*, 810 F. Supp. 2d 56, 72 (D.D.C. 2011), *vacated and remanded on other grounds*, 694 F.3d 123 (D.C. Cir. 2012) ("rulemakings affect the rights of broad classes of unspecific individuals" and are "prospective, and ha[ve] a definitive effect on individuals only after the rule subsequently is applied") (citing *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244-45 (1973)).[2]

113. The Policy interferes with the role of the FDA, abruptly changes the method of reimbursement without any reasoned or satisfactory analysis, and ignores critical comments about the issues with the Policy.

114. As a result of this illegal and invalid Policy, and without this Court issuing a preliminary injunction, Regenative will suffer irreparable harm due to Defendants attempting to regulate Regenative's lawfully marketed Section 361 HCT/Ps as Section 351 biologic products, which will create imminent harm to Regenative, as it may soon need to close its business because many providers will not be able to purchase its products without reimbursement, and it creates confusion in the medical community whether Regenative's products are lawfully marketed, when Regenative has taken great care to ensure that its products meet all requirements of Section 361 and are marketed, labeled, and promoted for use under that regulatory pathway. Defendants lack the authority to step into the shoes of the FDA or to ignore the statutes Congress enacted. However,

---

[2] 42 U.S.C. § 1395y(l)(D(5) requires that any LCD "make available on the Internet website of such contractor and on the Medicare Internet website, at least 45 days before the effective date of such determination, the following information: (i) Such determination in its entirety; (ii) Where and when the proposed determination was first made public; (iii) Hyperlinks to the proposed determination and a response to comments submitted to the contractor with respect to such proposed determination; (iv) A summary of evidence that was considered by the contractor during the development of such determination and a list of the sources of such evidence; (v) An explanation of the rationale that supports such determination." None of this required information was provided by the MACs, let alone with 45 days' notice.

if the Policy is allowed to go forward and be enforced, then such improper, overreaching conduct will be endorsed and allowed to stand without an iota of authority or support.

115.    Substantial, imminent, and irreparable injury will result because Regenative cannot recover the lost revenue from providers who stop using Regenative's products because the Policy sets forth a blanket denial of coverage for Regenative's products, and Regenative will likely be forced to close its business in light of confusion .

WHEREFORE, Plaintiff respectfully requests that this Court enter a permanent injunction prohibiting implementation of the Policy, and enter a declaratory judgment that the Policy is arbitrary and capricious and contrary to law.

## COUNT II
### Declaratory And Injunctive Relief
### (APA – Agency Action in Excess of Statutory Authority)

116.    Plaintiff incorporates each of the paragraphs in this Complaint as if fully set forth herein.

117.    The Policy notice attempting to re-classify Regenative's products as Section 351 products is predicated on Defendants' overstepping out of their statutory authority and into the role of the FDA's statutory authority.  No statute grants Defendants discretion to re-classify products as Section 351 or Section 361 products.  Thus, the Policy is in excess of Defendants' statutory authority and in violation of 5 U.S.C. § 706(2)(C).

WHEREFORE, Plaintiff respectfully requests that this Court enter a permanent injunction prohibiting implementation of the Policy, and enter a declaratory judgment that the Policy is agency action in excess of statutory authority.

## COUNT III
### Declaratory And Injunctive Relief
### (Failure to Convene Rulemaking Requirements)

118.    Plaintiff incorporates each of the paragraphs in this Complaint as if fully set forth herein.

119.    Defendants failed to initiate rulemaking to classify all placenta tissue products as Section 351 products, as required by APA, 5 U.S.C. § 553(b)-(c).

120.    Application of this new, novel, and blanket re-classification of FDA products causing the blanket denial of coverage for Regenative's products, without proper rulemaking was illegal because Defendants made this re-classification without a reasoned explanation and without lawful notice-and-comment, to a class of products in spite of Congressional intent otherwise as demonstrated by separate statutory schemes governing Section 361 and 351 products.  Defendants established new legal criteria for determining the regulatory classification of placenta tissue products without complying with the APA requirements for establishing new rules.

121.    Defendants further imposed new rules that create new FDA-approval requirements for placenta tissue products without undertaking the rulemaking process.  When changing a long-standing policy, which approved the coverage of Section 361 placenta tissue products, and imposing substantial harm upon many entities and individuals an agency is required under the APA to consider input from industry and the public.

122.    For the foregoing reasons, Defendants' conduct was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of authority granted by law, and without observance of procedure by law.

- 27 -

WHEREFORE, Plaintiff respectfully requests that this Court enter a permanent injunction prohibiting implementation of the Policy, and enter a declaratory judgment that the Policy is null and void for failure to observe the procedure required by law.

## **PRAYER FOR RELIEF**

1.    WHEREFORE, Plaintiff Regenative prays that this Court grant the following relief:

    a.    Injunctive relief and a Declaratory Judgment that:

        i.    Vacates Defendants' Policy;

        ii.    Declares that Defendants' Policy determination was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of authority granted by law, and without observance of procedure required by law; and

        iii.    Declares that Regenative is a Section 361 product that does not require FDA approval and should be reimbursed as such to maintain the status quo.

    b.    Award to Plaintiff its costs and attorneys' fees;

    c.    Such other relief as may be just and proper.

[signature blocks on next page]

Respectfully submitted,

Dated: <u>March 15, 2022</u>

By:_*Brian H. Pandya*_____

Brian H. Pandya
DUANE MORRIS LLP
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
Tel: 202.776.7800
Email: BHPandya@duanemorris.com

Robert M. Castle III
(pro hac vice forthcoming)
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, TX 75201
Tel: 214.257.7211
Email: RMCastle@duanemorris.com

Frederick R. Ball
(pro hac vice forthcoming)
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724
Tel: 857.488.4229
Email: FRBall@duanemorris.com

Patrick C. Gallagher
(pro hac vice forthcoming)
DUANE MORRIS LLP
1875 NW Corporate Boulevard
Suite 300
Boca Raton, FL 33431-8561
Tel: 561.962.2131
Email: PCGallagher@duanemorris.com

Andrew J. Rudowitz
(pro hac vice forthcoming)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Tel: 215.979.1974
Email: AJRudowitz@duanemorris.com

## VERIFICATION

I, Tyler Barrett, Chief Executive Officer and President of Row 1 Inc. D/B/A Regenative Labs ("Regenative"), make this verification on behalf of Regenative. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the allegations in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief. I understand that this verification is made subject to the penalties of perjury relating to unsworn falsifications to authorities.

Executed on:  March 14, 2022