**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ROW 1 INC. D/B/A REGENATIVE LABS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **XAVIER BECERRA, SECRETARY OF** | ) | |
| **HEALTH AND HUMAN SERVICES**, solely in | ) | Civil Action No. 22-0718 (APM) |
| his official capacity; et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.     CMS Failed to Follow Notice-and-Comment Rulemaking Procedures Before Implementing the Statements of Policy in the Three TDLs. ................................................2

II.    Section 405(h) Does Not Deprive this Court of Subject Matter Jurisdiction Over Plaintiff's Claims. ........................................................................................................11

      A.     Section 405(h) does not preclude claims challenging Government's failure to follow statutorily required notice-and-comment procedures............................ 12

      B.     Plaintiff's claims fall within the recognized exception to Section 405(h) for cases that would lead to no review at all if channeled for administrative review..................................................................................................................... 15

      C.     This Court has jurisdiction to issue a writ of mandamus to order the Government to comply with its statutorily required rulemaking obligations *before* implementing new rules or policies.......................................................... 18

III.   Regenative's Claims are Ripe for Adjudication ...............................................................21

IV.    The Government's Argument That Its Alleged Voluntary Cessation of the Policy Moots Plaintiff's Claims is Contrary to Well-Pled Facts and Established Law. ...............23

V.     Dismissing the MACs would be premature at this stage of the proceedings.....................28

VI.    Conclusion ......................................................................................................................29

# **TABLE OF AUTHORITIES**

**Cases**

*Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852, 859 (D.C. Cir. 2007) ...................... 16

*Akebia Thera., Inc. v. Becerra,* 548 F. Supp. 3d 274 (D. Mass. 2021) ................................... 17, 23

*Akiachak Native Cmty. v. Dep't of Interior*, 827 F.3d 100, 105-06 (D.C. Cir. 2016) ................. 26

*Allee v. Medrano*, 416 U.S. 802, 810 (1974) ............................................................. 25

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) .................................................... 25

*American Bird Conservancy v. F.C.C.*, 516 F. 3d 1027, 1032 n. 1 (D.C. Cir. 2008) ................. 23

*American. Chiropractic Ass'n, Inc. v. Leavitt,* 413 F.3d 812, 816 (D.C. Cir. 2005) ................... 16

*American Clinical Lab. Ass'n v. Azar*, 931 F.3d 1195, 1206 (D.C. Cir. 2019) ......................... 13

*American Hospital Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) .......................... 18, 19

*Azar v. Allina Health Services*, 139 S. Ct. 1804, 1808-09 (2019) ...................................... 2, 3

*Baxter Healthcare v. Weeks*, 643 F. Supp. 2d 111, 115-16 (D.D.C. 2009) ............................... 17

*Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 30-31 (D.D.C 2012) .............................. 22

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001) ........................................................................................ 24

*Chi. Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 305 n.14 (1986) .. 24

*City of Erie v. Pap's A.M.*, 529 U.S. 277, 287–89 (2000) ............................................... 24

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ................................. 24

*Council for Urological Interests v. Sebelius*, 668 F.3d 704, 710 (D.C. Cir. 2011) .... 5, 15, 16, 17

*Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) ............................................... 25

*DL v. District of Columbia*, 187 F. Supp. 3d 1, 5 (D.D.C. 2016) .................................... 25, 27

*Finca Sinta Elena, Inc. v. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 367 (D.D.C. 2012) ....... 22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) ...... 24, 25, 26

*Genus Medical Technologies LLC v. United States Food and Drug Administration*, 994 F.3d 631 (D.C. Cir. 2021) ................................................................................ 9, 10, 11

*Gray v. Sanders*, 372 U.S. 368, 376 (1963) ............................................................. 25

*Heckler v. Ringer*, 466 U.S. 602, 610 (1984) ........................................................... 14

*Helomics Corp. v. Burwell*, 2016 U.S. Dist. LEXIS 47803, at *14 (D.D.C. April 8, 2016) ........ 20

*Int'l Union, United Mine Workers of America v. Mine Safety and Health Admin.* 407 F.3d 1250, 1259 (D.C. Cir. 2005) ...................................................................... 6

*Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001) ..................................... 18

*Montefiore Med. Ctr. V. Leavitt*, 578 F. Supp. 2d 129, 133-34 (D.D.C. 2008) ........................... 9

*Nat'l Assoc. of Home Health Agencies v. Schweiker*, 690 F.2d 932, 937 (D.C. Cir. 1982) ......... 12

*Nat'l Committee to Preserve Social Sec. v. Bowen*, 735 F. Supp. 2d 1069, 1073(D.D.C. 1990). 12

*Nat'l Harbor GP, LLC v. Gov't of the D.C.*, 121 F. Supp. 3d 11, 16 (D.D.C. 2015) ................... 23

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993) ............................................................................... 24

*Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1012 (8th Cir. 1984) ....... 28, 29

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 10 (2000) ..................... 14, 167

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113, 342 U.S. App. D.C. 268 (D.C. Cir. 2000) ............................................................................................. 23

*Stevens v. D.C. Dep't of Health*, 150 A.3d 307, 315-16 (D.C. 2016) .......................................... 12

*United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968) ........... 26

*United States v. Generix Drug Corp.*, 460 U.S. 453, 456 n.6 (1983) ......................................... 24

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 467-68 (2001) ........................................ 10

*Wolcott v. Sebellius*, 635 F.3d 757, 764-65 (5th Cir. 2011) ...................................................... 20

**Statutes**

42 U.S.C. § 1395hh .................................................................................................. 2, 3, 19

42 U.S.C. § 1395ii .................................................................................................... 3 12

42 U.S.C. § 1395kk-1 ................................................................................................ 28

42 U.S.C. § 405 ..................................................................................................... 3, 11, 12, 19

**_Regulations_**

42 C.F.R. § 421.5 ..................................................................................................... 28

In its Motion to Dismiss ("Motion"), the Government improperly attempts to recast and mischaracterize Plaintiff's claims as seeking to recover on claims for payment submitted to Medicare Administrative Contractors ("MACs"). Based on this fundamental mischaracterization, the Government mistakenly contends that the Court lacks subject matter jurisdiction because Plaintiff did not exhaust its purported administrative remedies (all while ignoring that Plaintiff is a manufacturer of medical products that lacks the ability to bring an administrative claim).

Contrary to the Government's arguments, this case is **not** seeking to recover for specific claims decisions; rather, Plaintiff's claims focus on the Centers for Medicare and Medicaid Services' ("CMS") development and implementation of policies in secret, without notice-and-comment, and in contravention of its statutory authority.

Instead of following the statutorily-required rulemaking process, CMS changed the substantive legal standards by which multiple classes of products, including Regenative's products, are evaluated for reimbursement by secretly issuing Technical Direction Letters ("TDLs") to each of the MACs. Those TDLs explicitly instructed the MACs to automatically deny all claims for "manipulated amniotic and/or placental tissue" because, *inter alia*, they had not been proven to be "safe and effective" and required an investigational new drug trial. CMS further indicated that its February 2022 policy in the TDLs would be applied retroactively to December 2019 and instructed the MACs not to disclose the TDLs outside of their organizations. Given the misleading information and instructions in the TDLs, which improperly lumped all amniotic and placental tissue products together in an undifferentiated morass while ignoring the clear distinctions Congress implemented, it is unsurprising that CMS's policy was implemented behind closed doors. CMS's unsupported actions and mistaken contentions effectively made

Regenative's products unsellable to healthcare providers, who had come to rely on Regenative's innovative products to provide care for their patients.

While CMS contends it rescinded the policy and instructions from the first two TDLs through the issuance of a third TDL on March 25, 2022, Plaintiff has alleged facts showing that the original instructions to deny all claims continued after that date and that MACs explained that they had been instructed to apply the original policy from the improper February TDLs.  The conduct alleged exemplifies why voluntary cessation is consistently found to be insufficient to moot a claim.

As explained below, the Amended and Verified Complaint, ECF No. 19 ("Am. Compl."), plainly set forth sworn facts that establish both this Court's jurisdiction over Regenative's claims and that CMS (and the MACs) acted arbitrarily and capriciously and in excess of applicable statutory authority

## I.    CMS Failed to Follow Notice-and-Comment Rulemaking Procedures Before Implementing the Statements of Policy in the Three TDLs.

The Medicare statute expressly requires CMS to comply with specific notice-and-comment requirements when implementing requirements, rules, or policies that substantively change a legal standard governing the provision of benefits under the Medicare statute:

> No rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1)

42 U.S.C. § 1395hh(a)(2); *see also Azar v. Allina Health Services*, 139 S. Ct. 1804, 1808-09 (2019). These requirements are specific to the Medicare statute and even more restrictive than the notice-and-comment requirements of the Administrative Procedure Act ("APA").  *See Allina Health Services*, 139 S. Ct. at 1809.  The Medicare statute further provides, "[t]he [Secretary of

Health and Human Services] shall have full power and authority to make rules and regulations and to establish procedures, *not inconsistent with the provisions of this subchapter* … [and] *shall* adopt reasonable and *proper* rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder."   42 U.S.C. § 405(a) (emphasis added); 42 U.S.C. § 1395ii (implementing and applying, *inter alia*, 42 U.S.C. § 405(a) to the Medicare statute).   The Government failed to do so here, which is the very basis of Plaintiff's Amended Complaint and an independent basis to deny the Motion.

      The Supreme Court's decision in *Allina Health Services* highlights the breadth of the Government's obligations in cases akin to this one.   There, CMS posted on a public website without notice-and-comment the manner in which it was going to calculate the amount of certain payments to hospitals treating patients entitled to benefits under Medicare.   *Allina Health Services*, 139 S. Ct. at 1810.   In finding that the Government had violated the Medicare statute's notice-and-comment mandate, the Supreme Court explained that the phrase "substantive legal standard" in the Medicare statute was broader than the requirement of notice-and-comment for "substantive rules" under the APA.   *Id.* at 1811 (citing 42 U.S.C. § 1395hh(a)(2)).   Thus, regardless of what label (such as a "TDL") the Government gives a policy it implements, the notice-and-comment requirement under the Medicare statute applies to decisions and actions that "*really are* statements of policy." *Id.* at 1811 (emphasis in original).   Accordingly, the Supreme Court rejected CMS's proposed policy, as CMS failed to comply with the Medicare statute's strict statutory notice-and-comment requirements.   *Id.* at 1808, 1814.

While CMS violated the Medicare statute's notice-and-comment requirements in *Allina Health Services* by merely posting a statement of policy that changed a substantive legal standard, here, CMS's actions are far more egregious.  In *Allina*, CMS at least posted the new policy publicly (albeit without opportunity for notice-and-comment). Here, however, CMS's actions were far more covert. It issued the first of two TDLs solely to the MACs on February 2, 2022, which instructed MACs to automatically deny payments for "claims of manipulated amniotic and/or placental tissue biologics for injections on the grounds that such products are unsafe and experimental."  *See* Motion at 2.[1]   Further, as part of this *sub rosa* mandate, CMS indicated that the MACs were to apply this new policy retroactively to any claims submitted and paid between December 6, 2019 and the then-present.  *See* Am. Complaint ¶7.  Shortly thereafter, CMS issued the second TDL to provide further instruction on how to operationally implement the first TDL and specifically identified products, including those of Plaintiff, for which claims were to be denied automatically.[2]

Importantly, both of the February TDLs instruct the MACs that "[t]his Technical Direction Letter (TDL) cannot be distributed, in whole or in part, outside of the recipient's organization."  *See* Motion, Ex. A at 1, Ex. B at 1, ECF No. 23.  If it was not acceptable for CMS to merely announce a statement of policy publicly and without notice-and-comment, as it did in *Allina Health*

[1] Notably, Plaintiff's products are not "manipulated" or "biologics" as such terms are defined and used in the Food, Drug & Cosmetic Act ("FDCA").  Further, neither of the first two TDLs provided any authority granting CMS the ability to determine what regulatory scheme governs biologics or HCT/Ps or its basis for having determined that such products are unsafe.  *Id.*

[2] The first TDL expressly applied to "manipulated" products, which would not have included Plaintiff's products, which are minimally manipulated.  Ignoring this distinction, CMS included Plaintiff's products in the list of products in the second TDL for which claims are to be denied.  Thus, CMS' policy ignored a Congressionally-enacted regulatory pathway that CMS, itself, was aware of and had applied previously.

*Services*, it surely cannot be acceptable for CMS to covertly implement a statement of policy (seeking to change a substantive legal standard and to apply that change retroactively) by secret communication to the MACs, without letting the public know what the policy is and also allowing for the statutorily required notice-and-comment.  Plaintiff, and the rest of the public for that matter, were deprived of any opportunity to participate in the rulemaking process.  *See Council for Urological Interests v. Sebelius*, 668 F.3d 704, 710 (D.C. Cir. 2011) ("Although the Council and its members may not bill Medicare directly, they are free to participate in rulemakings.")

The Government also cannot reasonably dispute that the three TDLs at issue here are statements of policy.  TDL-220221, issued February 2, 2022, explicitly instructs MACs to categorically "deny payments for claims of manipulated amniotic and/or placental tissue biologics for injections."  Defs.' Mot. to Dismiss Ex. A at 1.  This first TDL proceeds to suggest that all such products are illegally marketed.  *Id.*  The second TDL, issued February 16, 2022, follows up on the first TDL and reiterates that "all claims for dates of service on or after December 6, 2019, shall be denied."  *Id.* Ex. B at 1.

As alleged by Plaintiff, the second TDL *incorrectly* states that manipulated amniotic and/or placental tissue products are exosome biologic products and that all such products can only be provided within approved investigational new drug (IND) trials.  *Id.*[3]  The second TDL proceeds

---

[3] Had CMS properly employed notice-and-comment procedures, perhaps these  statements could have been corrected.  Moreover, the mandates in the first two TDLs (in particular those in the second TDL) do not recognize the differences between "biologics" and HCT/Ps, between "manipulated" and minimally-manipulated, and between the two, clearly distinct regulatory paths Congress recognized in enacting Sections 351 (42 U.S.C. § 262) and 361 (42 U.S.C. § 264) of the Public Health Service Act.  *See* "Guidance for Industry:  Regulation of Human Cells, Tissues, and Tissue-Based Products (HCT/Ps) – Small Entity Compliance Guide" (August 2007) (the "August 2007        FDA        Guidance")        at        2,        *available        at*: https://www.fda.gov/files/vaccines%2C%20blood%20%26%20biologics/published/Regulation-of-Human-Cells--Tissues--and-Cellular-and-Tissue-Based-Products-%28HCT-Ps%29---Small-

to instruct the MACs to deny any incoming claim that contains a specific list of Healthcare Common Procedure Coding System ("HCPCS") Q codes, including Q4246—the code for Regenative's CoreText and ProText HCT/P products (none of which are manipulated or regulated as a drug, device, or biological product). *Id.* Ex. B at 2. (The statements, notices, subsequent denials, TDLs, and any other items of underlying policy are referenced herein as the "Policy.")

Part of the purpose of notice-and-comment requirements is to assist government agencies in addressing flaws in proposed regulations or statements of policy *before* such policies are implemented. *Int'l Union, United Mine Workers of America v. Mine Safety and Health Admin.* 407 F.3d 1250, 1259 (D.C. Cir. 2005) ("Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.").  It is thus unsurprising that the two February TDLs are flawed statements of policy replete with errors.  They provide zero guidance as to how to determine whether the products are reasonable or medically necessary, zero guidance as to how to determine whether a product should be considered "manipulated," and zero guidance as to the nature and extent of proofs and evidence to establish the right to benefits for such products.  Am. Compl. ¶¶ 5-7.  Moreover, neither TDL provides any mention of the two, clear, distinct regulatory pathways Congress enacted (much less guidance and

---

Entity-Compliance-Guide--Guidance-for-Industry.pdf (explaining that the FDA's regulatory framework recognized that some tissue products would be regulated as HCT/Ps under Section 361 and the FDA's related regulations while others would be "regulated as drugs, devices, and/or biological products under Section 351…and/or the Federal Food, Drug, and Cosmetic Act."); *see also* "Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue Based Products:  Minimal Manipulation and Homologous Use – Guidance for Industry and Food and Drug Administration Staff" (July 2020) (the "July 2020 FDA Guidance") *available at*: https://www.fda.gov/media/109176/download (distinguishing, *inter alia*, minimally manipulated products from manipulated products).

instruction on how to assess products governed under 351 and those under 361).  Finally, CMS's claim that all injectable birth tissue products are "exosome products" is simply scientifically inaccurate.  *See* Letter from American Association of Tissue Banks to the Honorable Chiquita Brooks-LaSure, dated March 22, 2022, *available at*: https://www.aatb.org/sites/default/files/2022/CMSBirthTissueMACfinal20220322.pdf.

All of these flawed TDLs were issued without complying with the statutorily required notice-and-comment procedures under 42 U.S.C. §§ 405(a) and 1395hh.  There can be no reasonable dispute that with the two February TDLs CMS drastically altered the substantive legal standard with respect to these products based on improper implementation of policy, statements that are factually and scientifically inaccurate, and in contrast to its own prior decisions.  Specifically, Plaintiff submitted an application for a HCPCS code to CMS for its HCT/Ps.  In summarizing Plaintiff's application in Q1 2020, CMS stated:

> CoreText and ProText are regulated by the FDA as a human tissue product subject to Section 361 of the Public [Health] Service Act and 21 CFR 1271.

Centers for Medicare & Medicaid Services (CMS) Healthcare Common Procedure Coding System (HCPCS) Application Summaries and Coding Decisions: First Quarter, 2020 Coding Cycle for Drug and Biological Products at 63 (2020) (the "Q1 2020 Coding Decisions") *available at*: https://www.cms.gov/files/document/2020-hcpcs-application-summary-quarter-1-2020-drugs-and-biologicals-updated-04142020.pdf.  Following review of Plaintiff's application for a HCPCS Code, CMS made the decision to "[e]stablish a new Level II HCPCS code Q4246 'Coretext or Protext, per cc.'"  *Id.*  As of the time of the Q1 Coding Decisions, CMS was clearly aware of the two distinct regulatory frameworks governing human tissue products and the requirements of both 351 and 361.  Indeed, in that same summary of decisions, CMS refused to establish a code for a product (AmnioCyte) and expressly stated, "[a]fter a review of FDA's guidance, it does not appear

to CMS that the product that is the subject of this application, is appropriate for regulation solely under section 361." *See id.* at 61.  CMS referred that applicant to the DA to "obtain written feedback regarding how the product is appropriately regulated." *Id.*  CMS expressed no such concerns in connection with Plaintiff's products. *Compare id.* at 61 *with id.* at 63.

However, the February TDLs abandoned this standard and ignored the same guidance it referenced and applied when establishing a Q-code for Plaintiff's products while rejecting other applications based on questions involving the proper regulatory framework (*i.e.*, Section 351 or Section 361) governing such products.  Instead, CMS asserted—albeit incorrectly—that these products "are exosome biologic products that have not been proven to be safe and effective" and that they "may only be provided within approved investigational new drug (IND) trials." Defs.' Mot. to Dismiss Ex. A at 1, Ex. B at 1. CMS' decisions, actions, and misstatements created confusion within the MACs and effectively applied factors only applicable to 351 products to 361 products despite Congress and the FDA acknowledging and implementing distinct regulations governing different types of tissue-based products.  For example, one MAC issued a policy notice stating that "*any* amniotic and/or placental derived products without Pre-Market approval under Section 351 and the [FD&C] Act, along with their associated services will be denied." *See* Am. Compl.  ¶ 7 (emphasis added).

The two February TDLs thus reflect a drastic "about face" for CMS with respect to its policies towards products such as CoreText and ProText.  Specifically, CMS switched from recognizing the differences between products regulated under Section 361 and those regulated under Section 351 and/or the FDCA and acknowledging that Plaintiff's products are regulated by FDA as an HCT/P subject to Section 361 of the PHSA to saying Plaintiff's products are illegally marketed, not safe and effective, and must be regulated as a drug, which requires the denial of any

claims for any amniotic and/or placental tissue product.   Notably, CMS offered no basis or authority granting it such broad discretion so as to allow it to ignore the statutory framework Congress enacted.

The third TDL, issued March 25, 2022 (after the initial complaint in this case), similarly failed to comply with notice-and-comment requirements.   As explained more fully below in Section IV, the Government's argument that the third TDL moots Plaintiff's claims is contrary to the Plaintiff's well-pled facts and well-established law.   Regardless, the third TDL continued to advance CMS policies that suggested Regenative's products are illegally marketed, are not safe and effective, or may present safety concerns that put patients at risk.   Defs.' Mot. to Dismiss Ex. C at 1-2.   Although these are incorrect statements, they have negatively impacted Regenative's business, its reputation, and business plans going forward.   Such changes in policy should have gone through notice-and-comment rulemaking.   *See, e.g.*, *Montefiore Med. Ctr. v. Leavitt*, 578 F. Supp. 2d 129, 133-34 (D.D.C. 2008) (rejecting policy implementing changes to manner in which skilled nursing facilities were reimbursed because notice-and-comment procedures were required for agency to change its interpretation and implementation of Medicare reimbursement policy).

CMS's failure (or unwillingness) to comply with the Medicare statute's notice-and-comment requirements is not surprising in light of the nature of the instructions CMS provided to the MACs, CMS's decision to ignore (or failure to recognize) the distinct regulatory regimes, and its instruction to apply improper policies retroactively.   In *Genus Medical Technologies LLC v. United States Food and Drug Administration*, 994 F.3d 631 (D.C. Cir. 2021), the United States Court of Appeals for the District of Columbia Circuit addressed a situation similar to that present here.   Genus, a manufacturer of diagnostic contrast agents used in connection with imaging procedures, brought an action against the FDA challenging the FDA's decision to regulate its

products as drugs rather than devices.  Drugs and devices are subject to distinct regulatory regimes and are governed by separate divisions of the FDA.  *Id.* at 633.  Notably, the FDA holds new drugs to a high standard of pre-market review and approval (including clinical trials showing the drug is safe and effective); whereas the regulation of devices is more varied based on the level of risk posed by the device.  *Id.* at 634.  While Genus's products were (and had been) registered and regulated as a device, the FDA inspected Genus's facilities and issued a warning letter stating that Genus's products were "drugs" within the meaning of the FDCA.  *Id.* at 635-36.  Genus responded that its products met the definition of a "device," as defined by the FDCA, and the FDA responded that the products met the definition of "device" and "drug."  The FDA determined that Genus's products were "drugs," and Genus commenced litigation claiming that the FDA's decision was arbitrary and capricious and in excess of statutory authority under the FDCA and the APA.  The district court vacated the FDA's classification of Genus' products as a drug and remanded the matter to the FDA for further proceedings.  The FDA appealed.

In reviewing that decision, the D.C. Circuit explained that the legal issue before it was whether the FDCA granted the FDA discretion to classify as a "drug" a product that satisfies the statutory definitions of both a "drug" and a "device."  *Id.* at 637.  The D.C. Circuit affirmed the district court's decision, as the FDA could not identify any basis for its "near-limitless authority" to classify *any* device as a drug.  *Id.* at 643 (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 467-68 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes.")).  Specifically, the D.C. Circuit expressly held that the FDCA does not grant the FDA with discretion to classify as a "drug" any product that meets the statutory definition of a

"device." *Id.* at 644.  Devices must be regulated as devices, and drugs – if they do not also satisfy the device definition – must be regulated as drugs.  *Id.*

The reasoning of *Genus* is equally applicable here, as the regulation of drugs versus devices is akin to the regulation of products under 351 (which, like drugs, require pre-market approval and more oversight) versus products governed under 361 (which are governed under a wholly-separate regulatory regime).  When products, such as those of Plaintiff, are properly regulated solely under Section 361, CMS, like the FDA in *Genus*, lacks the discretion to require that all products be regulated under Section 351 and/or the FDCA.  Such discretion would allow an agency's actions to render a statute to be meaningless.[4]  Given CMS's about face, error-riddled instructions that ignored its own decision and the applicable statutory framework, and damaging statements regarding Plaintiff's products, it comes as no surprise that CMS' decision to implement the policy without regard to the Medicare's notice-and-comment requirements occurred behind closed doors. CMS' failure to follow statutory requirements concerning notice-and-comment requires that the Motion be denied.

## II.    Section 405(h) Does Not Deprive this Court of Subject Matter Jurisdiction Over Plaintiff's Claims.

Contrary to arguments from the Government, 42 U.S.C. § 405(h) (which addresses the finality of any decision by the Social Security Commissioner and is made applicable to the Medicare statute pursuant to 42 U.S.C. § 1395ii.) does not deprive this Court of subject matter jurisdiction over Plaintiff's claims.  First, Section 405(h)'s prohibition against certain actions to recover claims does not preclude an action to hold the Government accountable to follow required notice-and-comment procedures. Second, this case falls within the established exceptions to

---

[4] Moreover, CMS lacks the regulatory expertise to distinguish a 351 product and 361 product.

requiring administrative review prior to bringing a lawsuit in court. Third, as the Government does not seriously dispute, Section 405(h) does not extinguish subject matter jurisdiction for writs of mandamus under 28 U.S.C. §§ 1361.

> **A.** **Section 405(h) does not preclude claims challenging Government's failure to follow statutorily required notice-and-comment procedures.**

Where Plaintiff's claims are directed to vindicating procedural irregularities in CMS's failure to follow statutorily-required notice-and-comment procedures, Section 405(h) does not come into play or deprive the Court of subject matter jurisdiction.. *Nat'l Assoc. of Home Health Agencies v. Schweiker*, 690 F.2d 932, 937 (D.C. Cir. 1982); *Nat'l Committee to Preserve Social Sec. v. Bowen*, 735 F. Supp. 2d 1069, 1073(D.D.C. 1990). The relevant portion of Section 405(h) states "[n]o action against the United States, the [Secretary of Health and Human Services], or any officer or employee thereof shall be brought under Section 1331 or 1346 of title 28 *to recover on any claim* arising under this subchapter." 42 U.S.C. § 405(h) (as modified by 42 U.S.C. § 1395ii) (emphasis added).

Recognizing that the phrase "to recover on any claim" is not limited to actions to establish monetary amounts of claims, the phrase must have some meaning under traditional rules on statutory interpretation. *Stevens v. D.C. Dep't of Health*, 150 A.3d 307, 315-16 (D.C. 2016) ("[The] process of statutory interpretation [begins] by looking at the statute on its face, and if the meaning is clear from the face of the statute, we must give effect to that plain meaning. . . . One of the most basic interpretive canons is that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal citations and quotation marks omitted)). Congress could have said—but did not say—that no action arising under this subchapter may be brought under Section 1331 or 1346. The actions for which jurisdiction is precluded are limited to those "to recover on any

12

claim." Accordingly, the plain language of the statute leaves open other actions under the Medicare statute, such as here, to hold the Department accountable to follow required formal rulemaking procedures under Sections 405(a) and 1395hh, as well as the APA. *See Am. Clin. Lab. Ass'n v. Azar*, 931 F.3d 1195, 1206 (D.C. Cir. 2019) (holding that section of Medicare statute stripping court of jurisdiction over review of establishment of payment amounts does not deprive court of jurisdiction over review of rulemaking process, including notice and comment).

Plaintiff's claims for relief here are purely procedural and are not within the scope of Section 405(h). Plaintiff's cause of action is not to recover unpaid Medicare claims; rather it challenges CMS's failure to follow required rulemaking procedures and CMS's actions in excess of its statutory authority in improperly adopting policies. Plaintiff's request for relief is to set aside the unlawfully adopted TDLs, to declare that the policy was not issued and adopted in accordance with law and in excess of authority granted by law, and to declare that Regenative's products should be regulated and viewed as an HCT/P solely regulated under Section 361 (which CMS expressly acknowledged in writing in Q1 2020) *to maintain the status quo* that existed prior to the CMS's unlawful adoption of the Policy. Am. Compl. 32-33.

None of the cases cited by the Government address Plaintiff's claims because none of those cases address the requirements under Sections 405(a) and 1395hh that CMS must follow formal rulemaking procedures in issuing statements of policy implementing the Medicare statute. Defs.' Mot. to Dismiss 16-17. Instead, those cases involve actions for benefits or reimbursement under Medicare or Medicaid, and they do not provide a basis to bar jurisdiction in this case.

In *Illinois Council*, the question addressed by the Court was whether a group of individuals "[n]eeding advance knowledge for planning purposes, [can] together bring a § 1331 action challenging such a rule or regulation on general legal grounds" or is such an action one "to recover

on any claim arising under the [Medicare statute]?"  *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 10 (2000) (internal quotation marks omitted).  There, the Court held that the claims brought by the Plaintiff, an association of nursing homes, concerning potential future issues with respect to reimbursement under specific Medicare regulations were barred under Section 405(h).  *Id.* at 25.  Similarly, in *Heckler v. Ringer*, the Supreme Court held an action brought by Medicare beneficiaries was barred by Section 405(h) where the "essence of their complaint is that the Secretary has a constitutional and statutory obligation to provide payment for BCBR surgery."   466 U.S. 602, 610 (1984).  The Court held that challenges to the methodology adopted by the Secretary were "inextricable intertwined" with the beneficiaries' claims for benefits, and thus were barred.  *Id.* at 614.  The relief requested included "a substantive declaration [] that the expenses of BCBR surgery are reimbursable under the Medicare Act."  *Id.*

In both *Illinois Council* and *Ringer*, the Court focused on the essence of the claims asserted, including the relief requested, in determining that Section 405(h) barred an action by a group of Medicare providers or Medicare beneficiaries.  Specifically, the Court found that both cases involved seeking benefits or reimbursement under Medicare or Medicaid.  By contrast, here, Regenative's claims and the relief requested are specifically targeted solely to holding CMS accountable for the statutorily-required rulemaking process within the scope of its statutory authority.  As pled in Regenative's Amended Verified Complaint, "[t]he [APA] requires agencies to provide an opportunity for industry and public notice-and-comment before issuing any rule or policy" or a local coverage determination.  Am. Compl. ¶ 133. "No statute grants Defendants discretion to re-classify products as Section 351 or Section 361 products," as done with the policy. *Id.* at ¶ 138. As "Defendants failed to initiate rulemaking to classify all placenta tissue products as Section 351 products, as required by APA," and "established new legal criteria for determining

the regulatory classification of placenta tissue products without complying with the APA," Defendants have acted arbitrarily and capriciously, "in excess of authority granted by law, and without observance of procedure by law." *Id.* at ¶¶ 140, 141, 143.  It is on these grounds—not grounds of Medicare or Medicaid reimbursement—that Regenative seeks relief.  The Court thus has federal question jurisdiction under Section 1331.

**B.    Plaintiff's claims fall within the recognized exception to Section 405(h) for cases that would lead to no review at all if channeled for administrative review.**

Section 405(h)'s channeling provisions do not apply in cases where the practical result is no judicial review at all. The Government argues that Section 405(h) *perforce* deprives this Court of subject matter jurisdiction under Section 1331 because Regenative failed to run the gauntlet of administrative review called for by the Medicare statute for beneficiaries and providers.  But the Government ignores that Regenative is a manufacturer and not subject to these channeling requirements.

For example, in *Council for Urological Interests v. Sebelius*, an association of doctors who owned equipment providers challenged regulations that prevented association members from receiving Medicare reimbursement. 668 F.3d at 705.  The Court of Appeals for the D.C. Circuit began by recognizing the untenable nature of the same argument the Government advances here:

> How does Section 405(h) apply when the Medicare Act provides an avenue for administrative and judicial review of a particular claim . . . . but not by the category of affected parties who wish to bring it.

*Id.* at 712.  The D.C. Circuit stated that the *Illinois Council* test is a "practical one" and applies "not only when administrative regulations foreclose judicial review, but also when roadblocks practically cut off any avenue to federal court." *Id.* at 712 (citing *Am. Chiropractic Ass'n, Inc. v. Leavitt,* 413 F.3d 812, 816 (D.C. Cir. 2005) and *Ill. Council*, 529 U.S. at 21-22).  In doing so, the Court rejected the argument that the Council members had to rely on the possibility that a Medicare

15

provider or beneficiary might bring a claim or to have a beneficiary assign his or her claim to a Council member. *Id.* at 713; *see also Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852, 859 (D.C. Cir. 2007).

The Government's brief appropriately cites to *Council for Urological Interests* for the legal proposition that the channeling requirement applies when an adequate proxy could raise the claims. Defs.' Mot. to Dismiss 20.  But here, there is no adequate proxy for Regenative, just as there was no adequate proxy in that case and the Court held that federal question jurisdiction existed under Section 1331.  As pled in Regenative's Amended Verified Complaint, the policy "creates confusion in the medical community whether Regenative's products are lawfully marketed and used" or, based on the Government's allegations, whether such products are "unsafe," as alleged in the Motion. Am. Compl. ¶ 12; Motion at 2.  But more importantly, and even after the purported revocation of the instructions in the first two TDLs, MACs now require providers "to submit impossible-to-obtain documentation for claims, such as 'FDA Approval or Clearance Letter for this Product,'" when submitting a claim for Plaintiff's products.  Am. Compl. at ¶ 117. Indeed, Plaintiff's products are properly regulated solely under Section 361, which does not require FDA Approval or a Clearance Letter.  *Id.*   For any provider to serve as a proxy, they would first need to submit a reimbursement claim (complete with all documentation required by the MACs) to Medicare or Medicaid for CoreText or ProText.  But it is impossible for providers to do so, as the required documentation does not exist and  is not required under Section 361.

Even if providers could obtain that non-existent documentation, the policy states that Regenative's products are unlawfully marketed, improperly used, and unsafe.  Defendants cannot legitimately expect a provider to purchase purportedly unlawful products and then bring an administrative claim to the federal government for reimbursement of those unlawful products, just to give Regenative the opportunity to challenge the Policy.

An adequate proxy is one that has sufficient incentive to make and diligently pursue an administrative proceeding on the same claims the Plaintiff is seeking to raise in federal court. *Council for Urological Interests*, 668 F.3d at 712-13.  In *Council for Urological Interests*, while hospitals were raised as a potential proxy, the hospitals had little incentive to pursue the claims of the Council, because hospitals could make more money not using equipment provided by Council members.  *Id*.  Similarly, in *Baxter Healthcare v. Weeks,* this court found that a manufacturer who did not itself have access to the administrative review process was not required to recruit a physician or hospital to act as a proxy.  643 F. Supp. 2d 111, 115-16 (D.D.C. 2009).  The Court distinguished a medical product manufacturer lacking access to the administrative process from lawsuits by trade associations where the association's members could each initiate administrative proceedings.  *Id.*; *see also Akebia Thera., Inc. v. Becerra,* 548 F. Supp. 3d 274 (D. Mass. 2021) (court found it had subject matter jurisdiction over an action by a drug manufacturer that was excluded from participating in the administrative review process itself).

As explained above, no proxy could possibly have the incentive to initiate and diligently pursue the claims Regenative is raising.  CMS has incorrectly and unlawfully suggested that Regenative's products are illegally marketed and may not be safe or effective.  *See* Defs.' Mot. to Dismiss Ex. A at 1, Ex. B at 1, Ex. C at 1.  What physician could possibly have the same incentive as Regenative to rectify that fallacy perpetuated by CMS?  As explained in the cases above,

Regenative, as a medical product manufacturer, does not have access to the administrative process, and thus cannot be barred by Section 405(h) from filing a lawsuit without pursuing an administrative process in which it does not have a right to participate. Accordingly, Regenative's claims fall within the exception to 405(h)'s channeling requirements recognized by the Supreme Court in *Illinois Council*.

>       C.      **This Court has jurisdiction to issue a writ of mandamus to order the Government to comply with its statutorily required rulemaking obligations *before* implementing new rules or policies.**

Additionally, Section 405(h) does not bar mandamus jurisdiction under 28 U.S.C. § 1361. *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001) ("[T]his court has previously determined that § 1361 jurisdiction is not barred [by Section 405(h)], joining the virtual unanimity of circuit courts.") The Government concedes as much, while halfheartedly arguing that the elements of mandamus jurisdiction are not established here. *See* Defs.' Mot. to Dismiss 22. Contrary to the Government's brief, Regenative's claims are focused specifically on requiring the government to follow required rulemaking procedures within the scope of CMS's statutory authority *before* implementing any rule or policy. This Court has mandamus jurisdiction here because Regenative can show (1) a clear and indisputable right to relief, (2) that CMS is violating a clear duty to act, and (3) that no adequate alternative remedy exists. *Am. Hospital Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) ("*AHA*").

It cannot reasonably be disputed that CMS had a clear statutory duty to promulgate regulations following the required notice-and-comment procedure. The statute is full of provisions requiring substantive rulemaking procedures to be followed:

> The Secretary *shall prescribe* such regulations as may be necessary
> . . .

42 U.S.C. § 1395hh(a)(1)

> No rule, requirement, or other statement of policy that established
> or changes a legal standard . . . *shall take effect* unless it is
> promulgated by the Secretary . . .

§ 1395hh(a)(2).

> The Secretary *shall establish and publish* a regular timeline for the
> publication of final regulations . . . .

§ 1395hh(a)(3)(A).

> [B]efore issuing in final form any regulation under subsection (a),
> the Secretary *shall provide* for notice of the proposed regulation in
> the Federal Register and a period of not less than 60 days for public
> comment thereon.

§ 1395hh(b)(1).

> The Commissioner . . . *shall adopt* reasonable and proper rules and
> regulations to regulate and provide for the nature and extent of
> proofs and evidence and the method of taking and furnishing the
> same in order to establish the right to benefits hereunder.

42 U.S.C. § 405(a).  Congress's consistent use of the typically mandatory "shall" demonstrates that CMS had a clear duty to follow the required rulemaking process, including notice-and-comment.  *See AHA*, 812 F.3d at 190.

Similarly, Regenative has a clear right to relief to insist that CMS follow the required rulemaking procedure.  Through the three TDLs, CMS covertly adopted a new Policy that changed the substantive legal standard regarding the scope of benefits available to Medicare and Medicaid beneficiaries and the payment for services, and, in so doing, explicitly identified the Q-code for Regenative's products as one for which all claims should be automatically denied.  Defs.' Mot. to Dismiss Ex. B at 2.  Further troubling is the fact that despite the TDLs' express application to "manipulated" rather than minimally manipulated products, CMS has created the impression with

the MACs that *all* amniotic and/or placental tissue products are subject to the TDLs, are illegally marketed unless they have pre-market approval from the FDA, and may not be safe or effective. Defs.' Mot. to Dismiss Ex. A at 1, Ex. B at 1, Ex. C at 1.  That was demonstrably untrue, at least with respect to Regenative's products.  Because CMS issued the confidential TDLs without notice-and-comment and indeed without even publication, but for this lawsuit, Regenative would not have any means to rectify or otherwise address the misimpressions CMS has created.

Finally, there is no alternative remedy for Regenative.  Exhausting the administrative process is not a prerequisite to jurisdiction for claims challenging failures of CMS to follow required administrative procedures.  *Helomics Corp. v. Burwell*, 2016 U.S. Dist. LEXIS 47803, at *14 (D.D.C. April 8, 2016).  "There is nearly unanimous consensus among the . . . circuits that 28 U.S.C. § 1361 provides jurisdiction in cases challenging the procedures used in administering . . . benefits but unrelated to the merits of the benefits claim."  *Id*. (quoting *Wolcott v. Sebellius*, 635 F.3d 757, 764-65 (5th Cir. 2011)).

The nature of the Medicare statute makes it especially imperative that the Government be held to strict compliance with their statutory obligations to provide advance notice of proposed rules and statements of policy and to give the public the required opportunity for public comment. The channeling provisions of administrative claims under Section 405(h) are broad and far-reaching with respect to administrative claims by Medicare providers to recover for services provided.  The Government cannot be allowed to abuse that channeling provision to issue confidential TDLs that substantively change legal standards for reimbursement while completely ignoring their statutory obligations with respect to notice-and-comment requirements.

Accordingly, this Court has jurisdiction to issue a writ of mandamus ordering the Government to comply with the administrative rulemaking procedures required under the Medicare statute.

## III.   Regenative's Claims are Ripe for Adjudication

When it makes its ripeness argument, the Government fails to acknowledge that Regenative filed a verified complaint which the government has not answered.  *See* Defs.' Mot. to Dismiss 23-26.  The complaint includes numerous allegations confirming that the parties have a live and ripe dispute.  *See, e.g.*, Am. Compl. ¶¶ 11 ("Despite these [TDLs] now disclosed by Defendants, Defendants' Policy has continued in full force . . . . After rescinding the Technical Direction Letters at issue, Defendants have issued a blatant mandate and policy stating that all liquid tissue products will be automatically denied in accordance with the purportedly-rescinded guidance that was in place in February 2022."), 105 ("CMS's March 25, 2022 [TDL], however, expressly makes clear that 'it is not intended by CMS, and shall not be construed, as a finding that any products are eligible for coverage or payment.'"), 108 ("In mid-April, well after the third CMS [TDL], a provider spoke with one of the MACs (Noridian) in an effort to better understand the Policy, and was informed . . . that although the MAC Policy statements have been removed from their websites, for the automatic denial of all liquid tissue products, 'Policy itself, for those injections, remains the same.'"), 115 ("The MACs concede that rather than a formal directive from CMS, there was an informal collaboration between CMS and all the MACs in furtherance of the Policy to deny these claims – despite CMS now taking the position that it has 'withdrawn' its prior Technical Direction Letters.").

The Government asks this Court to take its word for it that the claims are not ripe because it may at some point address its failures. Defs.' Mot. to Dismiss 25.  But that is not enough.  This case is not like *Finca Sinta Elena, Inc. v. Army Corps of Eng'rs*, where the government provided

"a number of uncontroverted affidavits" to support its ripeness argument.  873 F. Supp. 2d 363, 367 (D.D.C. 2012).  In contrast, the government has not provided a single affidavit supporting its position.

The Government also argues that this Court should defer ruling until the administrative record is fully developed. Defs.' Mot. to Dismiss 25.   However, the argument again mischaracterizes Regenative's claims.  Regenative claims, and the Government does not dispute, that CMS issued three TDLs affecting reimbursement for Regenative's product without engaging in the notice-and-comment rulemaking required under Sections 405(a) and 1395hh as well as the APA.  See Section I above.  In each of the cases relied upon by the Government, the agency was actively engaged in rulemaking or had not yet taken administrative action that harmed the plaintiffs.  For example in *Belmont Abbey Coll. v. Sebelius,* the agency was engaged in rulemaking that would address alleged faults in the original agency decision and equally importantly stayed the effect the original rule would have had on the plaintiffs for a year while it engaged in that rulemaking.  878 F. Supp. 2d 25, 30-31 (D.D.C 2012).  Here the government did exactly the opposite.  It failed to engage in rulemaking and then, when its failures were raised by the first complaint, it attempted to withdraw the improperly issued TDLs by issuing a third faulty TDL without staying the practical effect of its decision instructing the MACs to deny reimbursement.

Moreover, the Government does not deny that CMS issued the TDLS: two in secret and one after Regenative sued.  In the first two TDLs and its statements to the MACs after issuing the third TDL, the Government has made its position on reimbursement clear.  If the Government does not have a fully-developed administrative record related to those three TDLs that this Court can review, that is the Government's fault.  The Government's failure to engage in required notice-and-comment rulemaking should not prevent this Court from granting the relief sought by

Regenerative.[5]  *See* A*kebia,* 548 F.Supp.3d at 289; *see also American Bird Conservancy v. F.C.C.*, 516 F. 3d 1027, 1032 n. 1 (D.C. Cir. 2008) (rejecting argument that because the agency was "reconsidering" its position through notice-and-comment rulemaking because "agencies cannot avoid judicial review of their final actions because they have opened another docket that may address some related issues").

## IV.   The Government's Argument That Its Alleged Voluntary Cessation of the Policy Moots Plaintiff's Claims is Contrary to Well-Pled Facts and Established Law.

The Government argues that Plaintiff's claims are moot because Defendants have allegedly voluntarily rescinded the Policy.  Defs.' Mot. to Dismiss 28-29.  That argument fails for two reasons, one factual and one legal: (1) it ignores and contradicts Plaintiffs' factual allegations that the Policy has not been rescinded; and (2) it contradicts the Supreme Court's rulings that a party's voluntary cessation does not moot a challenge to that practice, particularly where the conduct is possible to recur.

First, the Government cannot attempt to re-write or ignore Plaintiffs' allegations.  In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), "the Court must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Nat'l Harbor GP, LLC v. Gov't of the D.C.*, 121 F. Supp. 3d 11, 16 (D.D.C. 2015) (quoting *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1113 (D.C. Cir. 2000)) (internal ellipses and quotation marks omitted).  The Government asserts, "[t]here is no dispute that the March 25, 2022, Technical Direction Letter rescinded the February 2, 2022, and February 16, 2022, Letters."  Defs.' Mot. to Dismiss 28.   This is plainly not true.

---

[5] If the Government has an administrative record related to the three TDLs, this Court should not dismiss this matter, but rather order the Government to produce that record.

Plaintiff acknowledges that CMS issued a March 25, 2022, Technical Direction Letter to the MACs purporting to revoke the Policy; however, Plaintiff alleges that despite these Technical Direction Letters, CMS's Policy has continued in full force and has not been rescinded. *Id.* at ¶¶ 8-11. Specifically, Plaintiff alleges that CMS's Policy continues to operate, requiring all liquid tissue products to be automatically denied in accordance with the (allegedly rescinded) Policy that was in place since February 2022. *Id.* CMS's "shadow rulemaking" has not been voluntarily rescinded. Indeed, Plaintiff alleges that the MACs have made expressly clear that "the Policy 'remains the same' despite the March 25 Technical Direction Letter and [Defendants'] prior statements to the Court." *Id.* at ¶ 11. Simply put, Plaintiff has sufficiently alleged that CMS's Policy has not been rescinded, and its claims are not moot.

Accordingly, the Court must treat Plaintiff's allegations as true and, in granting Plaintiff the benefit of all inferences that can be derived from the facts alleged, the Court should hold that the Policy has not been rescinded and thus, as a factual matter, Plaintiff's claims are not moot and should not be dismissed.

Second, although the Court need not address the remainder of the Government's argument, if so needed, the Supreme Court has held that a party's voluntary cessation of an unlawful practice will usually not moot its opponent's challenge to that practice. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287–89 (2000); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993); *Chi. Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 305 n.14 (1986); *United States v. Generix Drug Corp.*, 460 U.S. 453, 456 n.6 (1983); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *Cty. of Los*

24

*Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Allee v. Medrano*, 416 U.S. 802, 810 (1974).  Thus, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  This exception to the mootness doctrine exists because if a litigant could defeat a lawsuit simply by temporarily ceasing its unlawful activities, there would be nothing to stop that litigant from engaging in that unlawful behavior again after the court dismissed the case—the litigant would effectively "be free to return to [its] old ways." *Allee*, 416 U.S. at 811 (quoting *Gray v. Sanders*, 372 U.S. 368, 376 (1963)). *See also, e.g.*, *Friends of the Earth*, 528 U.S. at 189.

Here, the Government is clearly arguing that they have voluntarily ceased their unlawful Policy.  Defs.' Mot. to Dismiss 2-3, 28-29.  CMS has allegedly issued a (faux) rescission of the Policy, only after Plaintiff filed its complaint, in an attempt to divest this Court of jurisdiction and to avoid litigation wherein it would have to defend the improper rulemaking that occurred.  Putting aside the fact that the conduct has not ceased, there is nothing to prevent the Government from engaging in the same unlawful behavior if this case is dismissed—and the Government does not attempt to meaningfully argue that they are so prevented.  Accordingly, the voluntary cessation exception to the mootness doctrine applies here, and thus Plaintiff's claims are not moot.

The Government acknowledges that in order to get past the hurdle of the voluntary cessation exception to the mootness doctrine, they must prove two elements: (1) "that the challenged conduct cannot reasonably be expected to start up again"; and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Friends of the Earth, Inc.*, 528 U.S. at 189; *DL v. District of Columbia*, 187 F. Supp. 3d 1, 5 (D.D.C. 2016); Defs.' Mot. to Dismiss 29.

On the first prong, the Supreme Court has held that "[t]he 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc.*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)) (emphasis added).  The Court expands on this "heavy burden" in stating that the defendant claiming that its voluntary cessation moots a case "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (emphasis added). And what is the Government's argument to meet this formidable burden?  It is that "CMS has not announced any intention to reenact the previous Technical Direction Letters and has replaced the policy articulated therein with [a separate] instruction," and that Plaintiff's "conjecture that CMS has or would revive its previous Letters is entirely false and is insufficient." Defs.' Mot. to Dismiss 29-30.  In essence, Defendants' attempt to meet the heavy burden of showing that it is "absolutely clear" that their wrongful behavior cannot reasonably be expected to recur comes down to this: it cannot be reasonably expected to recur because Defendants "*say so*."  Defendants cannot meet their formidable burden with such a hollow, toothless argument.

Defendants cite *Akiachak Native Cmty. v. Dep't of Interior*, 827 F.3d 100, 105-06 (D.C. Cir. 2016) in support of their argument that they cannot reasonably be expected to re-engage in the wrongful behavior.  Defs.' Mot. to Dismiss 30.  *Akiachak*, however, involved procedural history wherein the district court had already held (at summary judgment) the challenged conduct to be contrary to law before the defendant revised its regulations, following notice-and-comment. *Akiachak Native Cmty.*, 827 F.3d at 105-106.  This case is inapposite.  The Government raises this argument at the motion to dismiss stage—not after summary judgment.  The court has not yet held that the challenged conduct was contrary to law.  And CMS has not followed proper notice-and-

26

comment.  Not only has the Government failed to show that its wrongful behavior cannot reasonably be expected to recur, but Plaintiff has alleged that the wrongful behavior has continued. Defendants, once again, fail to meet their burden.

On the second prong, this court need not determine whether all of the effects have been irrevocably eradicated.  As held in *DL v. District of Columbia*,

> Because the Court has already found that the defendants have not shown it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, the Court need not and will not determine whether all of the effects are eviscerated.  It is important to note, however, that these prongs are conjunctive, meaning that if the defendant has altered its behavior during litigation in a way that extinguishes the live controversy, it must satisfy *both* conditions to block the application of the voluntary cessation exception.

*DL*, 187 F. Supp. at 16.  In any event, Defendants cannot meet their burden on this prong, either. The Government argues that no further practical relief can be afforded to Plaintiffs because the MACs are not "process[ing] claims pursuant to their usual procedures for claim-by-claim reviews."  Defs.' Mot. to Dismiss 30.  Defendants appear to ignore Plaintiff's allegation that even after the March 25 Letter, Defendants' "automatic denial of Regenative's products [and the] 'Policy itself, for those injections, remains the same"—not the "claim-by-claim reviews" stated by Defendants.  Am. Compl. 11.  Defendants cannot show that the effects have been irrevocably eradicated when the effects are still being felt by the Policy remaining in place, and thus Defendants fail to satisfy their burden on the second prong, as well.

Accordingly, the Government's argument fails for any one of these four reasons: (1) Plaintiff has sufficiently alleged that CMS's Policy has not been rescinded; (2) the voluntary cessation exception to the mootness doctrine applies here, and thus Plaintiff's claims are not moot; (3) Defendants cannot meet the heavy burden that their wrongful behavior cannot reasonably be expected to recur; and (4) Defendants cannot prove that all of the effects have been irrevocably eradicated.  Thus, Plaintiff's claims are not moot, and the Motion should be denied.

V.      **Dismissing the MACs would be premature at this stage of the proceedings.**

Plaintiff fully understands and acknowledges that under 42 U.S.C. § 1395kk-1(d), the MACs are not subject to suit *except* for instances of reckless disregard or intent to defraud.  If the Government's factual assertion is accurate that the February change in Policy has actually been rescinded and that interim relief has completely eradicated the effects of implementing the unlawful Policy, then the MACs must be acting with reckless disregard because nothing has changed since CMS issued the third TDL in March of this year.

To be clear—it is Regenative's contention that CMS has not actually retracted its new Policy in any meaningful way.  Regenative believes that discovery will show that CMS continues to communicate additional policy changes to the MACs covertly without publication and without allowing the public an opportunity to comment.  But based on the factual allegations of the Government in its pleadings, if those allegations turn out to be true, then Regenative contends that the MACs are acting with reckless disregard for the substantive legal standards and policies they are charged with implementing.

In *Rochester Methodist Hosp. v. Travelers Ins. Co.*, the court rejected a fiscal intermediary's immunity defense, asserting that "agents, even government agents, may be subject to liability either in tort or in contract."  728 F.2d 1006, 1012 (8th Cir. 1984). In doing so, the court addressed 42 C.F.R. § 421.5(b), which makes the "Administrator . . . the real party of interest in any litigation involving the administration of the program." 42 C.F.R. § 421.5(b). The court held that § 421.5(b) does not necessarily "articulate[] a policy to clothe intermediaries with sovereign immunity"; rather "it does not necessarily follow from the denomination of the Administrator as the real party in interest that the intermediary is relieved from all liability for its own wrongful acts." *Rochester,* 728 F.2d at 1014. The court also looked at several cases where suits against MACs were barred by sovereign immunity, and distinguished them on the grounds that none of

them "address the rule that an agent of the government is responsible for its own torts" or the question of whether "the intermediary acted beyond the scope of its authority." *Id.* at 1015. At this point in the case, Regenative has sufficiently pled the MACs acted outside of their authority.[6]

## VI.   Conclusion

In conclusion, for all the foregoing reasons, the Court should deny the Government's motion to dismiss for lack of subject matter jurisdiction.  To the extent the Court is inclined to grant any part of the Government's motion, Regenative requests leave to re-plead.

---

[6] Further demonstrating why the MACs should not be dismissed at this stage, the Government readily admits that the MACs may be acting unlawfully by not following the Secretary's instructions.  Defs.' Mot. to Dismiss 25.

Respectfully submitted,

Date:   September 22, 2022

*/s/ Brian H. Pandya*
Brian H. Pandya (D.C. Bar # 501661)
DUANE MORRIS LLP
901 New York Ave. NW, Suite 700E
Washington, DC 20001
Tel: 202.776.7800
Email: BHPandya@duanemorris.com

Robert M. Castle III
(pro hac vice forthcoming)
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, TX 75201
Tel: 214.257.7211
Email: RMCastle@duanemorris.com

Frederick R. Ball
(pro hac vice forthcoming)
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724
Tel: 857.488.4229
Email: FRBall@duanemorris.com

Patrick C. Gallagher
(pro hac vice forthcoming)
DUANE MORRIS LLP
1875 NW Corporate Boulevard
Suite 300
Boca Raton, FL 33431-8561
Tel: 561.962.2131
Email: PCGallagher@duanemorris.com

Andrew J. Rudowitz
(pro hac vice forthcoming)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Tel: 215.979.1974
Email: AJRudowitz@duanemorris.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2022, I served a true and correct copy of the foregoing on all counsel of record in this action via ECF.

*/s/ Brian H. Pandya*